IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.  CRIMINAL ACTION NO.   3:13-00056

DARIUS LAJUAN KINCANNON

**MEMORANDUM OPINION AND ORDER**

Pending is Defendant's Motion to Suppress (ECF No. 18).  After hearing the evidence and argument presented by the parties during the October 7, 2013, pretrial motions hearing and reviewing the supplemental pleadings of the parties, Defendant's Motion to Suppress is **DENIED**.

Based upon the evidence presented at the hearing, the Court finds the following pertinent facts: At around 6 a.m. on February 5, 2013, Kyle Patton and Jason Smith—both Huntington police officers dressed in uniform—were conducting surveillance of the Greyhound bus station in Huntington. A bus from Michigan arrived. While watching the line of people from the bus unload, Officer Patton observed that Defendant was near the end of the line. Patton swung his attention to a couple exiting the bus and then refocused back on Defendant, at which point Defendant had taken a seat toward the front of the bus. Defendant, who was wearing a backpack, waited until everyone was off of the bus except for an elderly man and then immediately exited the bus behind the man, turned directly in front of the bus, and attempted to walk across the bus station lot. Patton approached Defendant and asked if he could talk with him. Defendant consented, stopped and walked halfway back to Patton, as Patton walked the rest of the distance toward Defendant. Patton asked for Defendant's name and I.D. Defendant provided a Michigan I.D. and his name, which

-1-

matched the I.D. Without returning the I.D., Patton asked where Defendant was coming from and where he was going. Defendant stated that he was coming from Michigan and headed to Huntington. When asked for clarification, Defendant stated that he was going to see a woman. Patton then asked for Defendant's bus ticket. Defendant replied that the bus company had kept his ticket. Patton then asked if there was anything in Defendant's bag that he "shouldn't have." Tr. Pretrial Mots. Hr'g 6-7. Defendant said, "No," and Patton asked if he could look in Defendant's bag. Defendant said, "No," and that he "had rights." *Id.* at 7. Patton said, "Yes, you do have rights, and I don't -- you can't let me look . . . . Do you care, though, if I run my K-9 around your bag?" *Id.* Defendant consented, saying, "No, that's fine." *Id.* Patton walked with Defendant to the bus station wall, where Defendant's backpack was then placed along the wall. Patton stated, "If you don't mind, I'm going to pat you down before we get started with my dog just for my safety . . . . Is that okay?" *Id.* Defendant said, "Yes." Patton instructed Defendant to interlock his fingers behind his back, and Patton held his hands behind his back while he conducted the pat-down. During the pat-down, Patton felt something in one of Defendant's pockets and asked if he could get it out. Defendant consented. Patton retrieved the item, but he does not now remember what it was. Throughout this encounter between Patton and Defendant, Officer Smith had been talking with the elderly man who got off of the bus immediately before Defendant. The man's bag was also against the wall, ready for a dog sniff test. Patton asked Smith to watch Defendant while Patton left the area to retrieve the K-9 from his car. Patton then conducted the K-9 check of the bags, and the K-9 alerted to Defendant's bag. Patton then "explained to [Defendant] that [the] K-9 had alerted on his bag and that [Patton] was going to take his bag and obtain a request for a search warrant unless [Defendant] wanted to let [Patton] look in it." *Id.* at 9. Defendant denied consent. Patton then

talked with Defendant about whether the dog had alerted (Defendant argued that it had not) and when Defendant could contest the search warrant (Defendant asked). Defendant continued to refuse consent to search his bag. Patton then asked Smith to speak with Defendant and try to get Defendant's consent. Smith did so, but Defendant continued to refuse consent. Patton took a photos of Defendant's I.D. with his phone—Patton had kept the I.D. throughout the entire interaction, which lasted about fifteen to twenty minutes—and then, after asking to what address Defendant would be going, returned it to Defendant. Defendant began to leave, then returned and asked to retrieve a cell phone charger from his bag. Patton said that he could not; they discussed it, and Defendant left.

In his Motion and in his Reply, ECF No. 25, Defendant argues that Officer Patton conducted an illegal seizure of Defendant's person by conducting an investigatory stop without reasonable, articulable suspicion that Defendant was engaged in criminal conduct. At the hearing, the Government conceded that, at the point when Defendant gave consent to have the K-9 sniff his backpack, Officer Patton did not have the reasonable suspicion required to conduct an investigatory stop of Defendant. However, in its Response, ECF No. 19, and in its Surresponse, ECF No. 26, the Government maintains that Officer Patton did not conduct an investigatory stop of Defendant and that the interaction was consensual.

"[A] police officer approach[ing] an individual and ask[ing] the person a few questions" does not result in a seizure of the person and does not require any level of suspicion "[s]o long as a reasonable person would feel free to disregard the police and go about his business." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request

consent to search luggage—provided they do not induce cooperation by coercive means." *United States v. Drayton*, 536 U.S. 194, 201 (2002). Such a non-seizure is referred to as a consensual "police-citizen encounter." *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012).

To determine if an encounter ceases being consensual and a seizure has occurred, "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 439. A court should consider a number of nonexclusive factors, including "the number of police officers present during the encounter, whether they were in uniform or displayed their weapons, whether they touched the defendant, whether they attempted to block his departure or restrain his movement, whether the officers' questioning was non-threatening" (meaning "the officer[s'] questioning was conversational rather than intimidating—i.e. did [they] raise [their] voice[s] or threaten the defendant[?]"), "whether they treated the defendant as though they suspected him of illegal activity rather than treating the encounter as routine in nature," and "the time, place, and purpose of an encounter." *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 461 (4th Cir. 2013) (internal quotation marks omitted); *Jones*, 678 F.3d at 299-300 (4th Cir. 2012) (internal quotation marks omitted); *United States v. Gray*, 883 F.2d 320, 322-23 (4th Cir. 1989) (internal quotation marks omitted).

In *Bostick*, the U.S. Supreme Court overturned the Florida Supreme Court's finding of a seizure[1] when two officers boarded a bus during a stopover, picked out the defendant passenger with no articulable suspicion, asked for his ticket and identification, found them to be

---

[1] The Court refused to make a final ruling regarding whether this was a seizure or a consensual police-citizen encounter, but it hinted strongly at the latter. *See Bostick*, 501 U.S. at 437.

unremarkable and returned them, explained that they were narcotics agents, and then requested for consent to search the defendant's luggage. 501 U.S. at 431-32. The Court noted that the police advised the defendant that he had the right to refuse consent and that the officers did not threaten the defendant with a gun. *Id.* at 432. The Court also modified its "free to leave" test to take into account the natural confines of sitting on a bus: when a defendant's "freedom of movement [is] restricted by a factor independent of police conduct . . . , the appropriate inquiry is whether a reasonable person would *feel free to decline the officers' requests* or otherwise terminate the encounter." *Id.* at 436 (emphasis added).

In *Drayton*, the Court held that plainclothes police officers did not seize passengers on a bus when, as part of routine drug and weapons interdiction efforts, they boarded the bus at a rest stop and began asking passengers questions, did not draw or brandish their weapons, made no intimidating movements, left the aisle free so passengers could exit, and spoke to passengers one at a time in a polite, quiet voice. 536 U.S. at 197, 203-04. It did not change the nature of the consensual encounter that the officers failed to inform passengers that they were free to refuse to cooperate and that one officer stayed at the front of the bus near the exit. *Id.* at 205-07.

Each of these Supreme Court cases supports the finding that the encounter in this case was consensual. Defendant was not constrained by presence on a bus during his encounter with Officer Patton. Only one officer approached Defendant; there is no indication of Patton brandishing a weapon, touching Defendant, blocking his exit, restraining Defendant, or acting threatening in any manner *before* Defendant gave consent to have his bag sniffed by the K-9. There is also no indication that Patton treated Defendant as though he suspected him of any specific illegal activity, or asked any questions more invasive than those asked in each of these Supreme Court cases. The

bus stop location was public and others were around. Importantly, Defendant felt free to decline the officer's request to search his bag immediately before being asked to consent to the K-9 check. It appears that the Defendant subjectively felt—and a reasonable person objectively would feel—both free to leave and free to decline consent to the K-9 check in this situation.

In his Reply, Defendant focuses upon the fact that 1) Patton took Defendant's I.D. at the beginning of the encounter and did not return it until the end, fifteen to twenty minutes later, and 2) Patton completed a full body frisk of Defendant while restraining Defendant's hands behind his back. Given that Defendant did not express any indication that he wished to revoke his consent to have his bag sniffed by the K-9 and that the frisk occurred after such consent was given, the frisk is not material to whether Defendant's interaction with Patton up until giving the consent was a seizure. Though Defendant is correct that the Fourth Circuit in *United States v. Weaver* stated that "numerous courts have noted that the retention of a citizen's identification or other personal property or effects is highly material" to determining whether a seizure took place, the court also refused to deem this factor dispositive of the issue:

> While it is without question that a driver's license is one of the most valuable pieces of personal identification possessed by any citizen, it does not logically follow that any time an officer retains someone's driver's license that such retention blossoms into an unconstitutional seizure.

282 F.3d 302, 310, 312 (4th Cir. 2002). The facts of *Weaver* are instructive: An officer approached the defendant, received consent to speak with him, and said that he had received a call concerning a suspicious person and that the defendant met the description. *Id.* at 307. He then obtained the defendant's driver's license, ran a check on it, and continued possessing it while he asked the defendant if he would accompany him to a nearby bank. *Id.* The defendant agreed, and the officer led the defendant to the bank. *Id.* Then the officer—who was still in possession of the defendant's

driver's license—asked for the defendant's consent to be driven in the officer's police cruiser to another bank. *Id.* The defendant agreed, and the officer patted down the defendant before letting him into the cruiser. *Id.* Later, the defendant argued that he had been seized when he accompanied the officer in the police cruiser to the second bank, while his license was being retained by the officer. *Id.* at 308-09. The court disagreed, noting that the defendant could have asked for his license back, but he did not. *Id.* at 312. Importantly, the court noted that *Weaver* was different from other cases in which an officer retained a defendant's driver's license because Weaver was not actively driving a car when he was approached by the officer, so he could have simply walked away if the officer refused to give him his license back upon request. *Id.* at 311. The court noted that this would have been "awkward," but stated that "awkwardness alone does not invoke the protections of the Fourth Amendment." *Id.* As in *Weaver*, Officer Patton's retention of Defendant's I.D., while unsettling, did not convert the interaction between Defendant and the officer into a seizure. Under the totality of the circumstances, the interaction remained consensual.

For the above-stated reasons, Defendant's Motion to Suppress (ECF No. 18) is **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel and the defendant, the U.S. Attorney's Office, the U.S. Probation Office, and the U.S. Marshals Service.

        ENTER:    October 28, 2013

        ROBERT C. CHAMBERS, CHIEF JUDGE